**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

BRAXTON J. COBB,

       Petitioner,

v.                             Case No. 8:10-cv-1796-T-30TBM

SECRETARY OF DEPARTMENT
OF CORRECTIONS,

       Respondent.

_____/

## ORDER

     Petitioner, a State of Florida inmate proceeding *pro se*, petitions for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 and challenges the validity of his conviction for sexual battery on a victim less than twelve years of age. (Dkt. #1). Petitioner challenges his conviction on the sole ground of trial court error.

### Procedural Background

     An information charged Petitioner, a person under eighteen years of age,[1] with committing a sexual battery upon the eleven year-old victim. (Dkt. #15, Ex. 1, Vol. I, p. 48). Before trial, Petitioner's counsel moved to suppress Petitioner's confessions or admissions. (Dkt. #15, Ex. 1, Vol. I, pp. 43-45). The state trial court denied the motion after a hearing. (Dkt. #15, Ex. 1, Vol. I, pp. 110-16). A jury convicted Petitioner and he was sentenced to one hundred eleven months imprisonment followed by twenty years of sex offender

_____

[1] Petitioner was seventeen years old when the crime occurred.

probation.  Petitioner appealed.  On June 10, 2009, the state district court of appeal affirmed Petitioner's conviction and sentence in a *per curiam* decision without written opinion.  (Dkt. #15, Ex. 4).  Petitioner filed no petition for writ of certiorari in either the Florida Supreme Court or the United States Supreme Court.

Petitioner filed his Section 2254 petition on August 9, 2010.  Respondent does not challenge the timeliness of the petition.  Upon review, the petition must be DENIED.

## Standard of Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs this proceeding.  *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000).  Section 2254(d), which creates a highly deferential standard for federal court review of state court adjudications, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with

respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one."  *Bell v. Cone*, 535 U.S. at 694.  *See Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide.").  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme court "as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case.  "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693  (2002).  Federal courts must afford due deference to a state court's decision.  "AEDPA prevents defendants - and federal

3

courts - from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, ____ U.S. ____, 130 S. Ct. 1855, 1866 (2010).

In a *per curiam* decision without a written opinion the state appellate court affirmed Petitioner's conviction and sentence on direct appeal. The affirmance warrants deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied*, 278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003).

Petitioner bears the burden of overcoming a state court factual determination by clear and convincing evidence. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact, but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001).

## **Factual Background**[2]

The police were notified about an alleged kidnapping and rape involving an eleven year old victim.[3] The victim told the police that "JJ" was the perpetrator and Petitioner knew "JJ's" identity. The police encountered Petitioner in the course of the investigation on February 8, 2007. Petitioner's aunt took Petitioner to the police station that day to speak with

---

[2] This summary of facts derives from Petitioner's brief on direct appeal and the state court record.

[3] The victim initially told the police that she was both kidnapped and raped. She later admitted that these allegations were false.

detectives because Petitioner was alleged to have had information about the case.  After some brief questioning, Petitioner, at his aunt's request, left the police station.  Petitioner was not a suspect at that time.  While at school the following day, Petitioner contacted his school resource officer, Tina Coleman, and told her that he had had consensual sexual intercourse with the victim.[4]  Coleman advised local law enforcement about Petitioner's statements and officers responded to the school.  Petitioner admitted to Detective Christopher Lynn that he had had intercourse with the victim.  Petitioner was arrested and, after having been advised of his *Miranda* rights and signing a *Miranda* waiver, gave a recorded statement to the police in which he again admitted having had sex with the victim.

**Ground One**

Petitioner contends that the state trial court erred by denying his motion to suppress his confessions/admissions.  Before trial, counsel moved to suppress "any and all statements by defendant to law enforcement in this case" because the statements were "not knowingly and voluntarily [given] and . . . any confessions or admissions were obtained by threats, promises, or an assertion of improper influence . . . in violation of the United States Constitution, [the] Florida Constitution and *Miranda*."  (Dkt. #15, Ex. 1, Vol. I, pp. 43-44). The state district court of appeal summarily affirmed the trial court's denial of the motion. (Dkt. #15, Ex. 4).

---

[4] Petitioner had sexual intercourse with the victim on February 5, 2007.  The victim told a friend about the incident three days later and the friend reported the incident to school officials.

Petitioner argues in this federal petition that "[t]he state court made a finding that Petitioner was not in custody and thus no custodial interrogation took place when Detective Lynn conducted the February 9, 2007, interview at Mulberry High School.  This finding is unreasonable in light of the facts presented at the suppression hearing and the clearly established principles of *Miranda* and its progeny."  (Dkt. #1, p. 7; #22, p.4).  Petitioner further contends that the state court erroneously determined that his pre-arrest and post-arrest statements were admissible despite the "question first, *Miranda* last" tactic.[5]  Petitioner

---

[5] Detective Lynn testified at the evidentiary hearing that he went to the high school to meet with Petitioner as a result of the information he received from Officer Coleman.  Although Petitioner became a suspect based on his statements to Officer Coleman, Detective Lynn did not advise Petitioner of his *Miranda* rights before talking with Petitioner at the school:

Q:   Okay.  So at the school he's a suspect at that point because you got another officer telling you that he's admitted to having sex with an 11 year old.  Is that correct?

A:   Yes.

Q:   Okay.  You didn't Mirandize him, correct?

A:   Correct.

Q:   And you elicit what you are saying [is] incriminating information from him, correct?

A:   Correct.

. . .

Q:   At the point you were outside the school and you knew - - or were advised by a fellow officer that he committed a crime, why didn't you read him Miranda?

A:   I was just told that, I wanted to confirm it myself.

Q:   So you wanted to get [an] incriminating statement from him before you - -

A:   Correct.

(Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, pp. 49-50).

contends that the rejection of his motion to suppress resulted in a denial of his rights under the Fifth, Sixth, and Fourteenth Amendments and the Florida Constitution.[6]

*Miranda* warnings apply only to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). When determining whether a suspect is in custody, "a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 320 (1994). The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004). "The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. at 320. *See also J.D.B. v. North Carolina*, ___ U.S. ___, 131 S.Ct. 2394, 2406 (2011) ("[W]e hold that so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis [under *Miranda*] is consistent with the objective nature of that test."). The relevant question is how

---

[6] No federal habeas relief is available for a violation of the Florida Constitution. A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief because no federal constitutional question is presented. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."). This limitation applies with equal force when a petition, which actually involves state law issues, is couched in terms of a Fourteenth Amendment due process violation. *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988).

a reasonable person in the suspect's position would perceive his circumstances. *Yarborough v. Alvarado*, 541 U.S. at 662.

Whether a suspect is "in custody" and subjected to police questioning, entitling him to *Miranda* warnings, presents two discrete inquires: "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112 (1995) (internal footnote omitted). The first inquiry is factual and a state court's findings on these "scene and action-setting questions" are entitled to a presumption of correctness. *Thompson v. Keohane,* 516 U.S. at 112. The second inquiry, the state court's determination of whether a suspect is "in custody" and entitled to *Miranda* warnings, is a mixed question of law and fact requiring independent review that is not entitled to a presumption of correctness under Section 2254. *Thompson v. Keohane,* 516 U.S. at 102, 112-13. "Habeas relief is available under Section 2254 (d)(1) only if the state court's decision is objectively unreasonable." *Yarborough v. Alvarado*, 541 U.S. at 665.

During the suppression hearing Detective David Cavanah testified that he responded to a call for a reported kidnapping and sexual battery. (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, p. 11). The victim told Cavanah that Petitioner knew the alleged perpetrator and that he could tell the police the perpetrator's name. While the police were interviewing the victim at her home, they observed Petitioner in the neighborhood. Petitioner was not a suspect at that time. Petitioner's aunt voluntarily drove him to the police station where the police questioned him for about half an hour. During the

interview, Cavanah made no threats or promises to Petitioner and did not coerce him into speaking with the police.  Petitioner was free to leave the interview at any time and he, in fact, left on his own accord.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, pp. 28-29).

Officer Tina Coleman, a school resource officer at Mulberry High School, testified that Petitioner sought her out while at school on February 9, 2007, and told her that he had had consensual sex with the victim.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 24, 2007, suppression hearing, p. 11).  Coleman made no threats or promises to Petitioner and did not use coercive techniques to elicit information from him.  Based on Petitioner's statements, Coleman contacted the Polk County Sheriff's Office and officers responded to the school.

Detective Christopher Lynn testified that he responded to Mulberry High School based upon Officer Coleman's report to the Polk County Sheriff's Office.  Coleman told Lynn that Petitioner had admitted to having consensual intercourse with the victim.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, pp. 36-37).  Based on that information, Petitioner was summoned from class.  Petitioner requested to speak to Lynn outside the school and again admitted to the sexual relations with the victim.  Three or four of Petitioner's family members were present outside of the school near Petitioner when he spoke to Lynn.[7]  Lynn attempted to record the conversation between himself and Petitioner

---

[7]  Officer Coleman told Petitioner that she had to report the information he had given her to the police.  Petitioner asked to contact his aunt, who later came to the school before Petitioner spoke to Detective Lynn.  Petitioner testified at the suppression hearing:

Q:     And was your aunt or aunts out there?

(continued...)

but the tape proved inaudible.  Lynn did not give Petitioner *Miranda* warnings while speaking to Petitioner at the school.  Lynn did not threaten Petitioner, did not make any promises to him, or use any coercive technique to elicit information from Petitioner.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, pp. 39-40).  Based on Petitioner's admission, he was arrested and transported to the Bureau of Criminal Investigations ("BCI").

Petitioner was given *Miranda* warnings at BCI.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, p. 42).  Lynn read the *Miranda* warnings to Petitioner, asked Petitioner if he understood his rights, and asked Petitioner if he wished to speak to Lynn.  Petitioner responded affirmatively.  Lynn gave Petitioner a written *Miranda* form which he read to Petitioner.  Petitioner indicated that he understood each of the rights read to him and signed and dated the form.   (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, p. 43).  After giving Petitioner the *Miranda* warning, Lynn conducted an unrecorded pre-interview during which Petitioner admitted to having had sex

---

[7](...continued)
A:       My aunt and my Grandma was [sic] out there.

Q:       How close were they to you and Lynn?

A:       Real close.

Q:       How real close?

A:       Like on my side.

(Dkt. #15, Ex. 5, Vol. V, transcript of October 22, 2007, suppression hearing, p. 68).

with the victim.  Lynn then obtained a recorded statement from Petitioner in which Petitioner again admitted to having sex with the victim.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, pp. 44-45).

Petitioner testified at the evidentiary hearing that he went to the BCI to talk with the police on February 8, 2007, because they told him that he "need[ed] to come down there." During questioning at the BCI on February 8, 2007, one of the detectives told Petitioner that they could give him "life or the death penalty."  Upon hearing this statement, Petitioner began to cry and the interview was terminated.  On his way out of the station, another officer told Petitioner that providing information to the police was Petitioner's "get out of jail free card."  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, pp. 62-63).  Petitioner testified that he felt pressured to give the police information and that Detective Cavanah threatened him during the February 8, 2007, interview.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, pp. 66-67).

Petitioner testified that the following day, February 9, 2007, he was at Mulberry High School and was summoned to the school's office where he met Officer Coleman.  Coleman told Petitioner that she needed to talk to him.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, pp. 64-65).  Detective Lynn came to the school and spoke with Petitioner.  Lynn told Petitioner that Coleman reported that Petitioner had admitted having sex with the victim.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, p. 68).  Petitioner testified that he did not tell Coleman that he had had sex with the victim.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression

11

hearing, pp. 68-69, 77-79).  Petitioner testified that both Officer Coleman and Detective Lynn lied when they testified to the contrary.[8]

Petitioner testified that he was read his *Miranda* rights after he was arrested.  (Dkt. #15, Ex. 1, Vol. V, transcript of October 22, 2007, suppression hearing, p. 70).  Petitioner

---

[8]  Petitioner testified:

Q:      Okay.  Isn't it a fair statement that you told [Officer Coleman] that you had sex with [the victim], that it wasn't a rape because you didn't want to be accused of doing something - -

A:      No, sir.

Q:       - - didn't do?

A:      No, sir.

Q:      So you're saying that if Officer Coleman says that you're just - - you're saying she flats [sic] out lying; correct?

A:      Yes, sir.

Q:      You're saying that when you confessed to Detective Lynn outside the school that he's lying because you never said that; correct?

A:      Sir?

Q:      You're saying Detective Lynn is lying as well?

A:      I never said I had sex with her.

Q:      Okay.  So when [Detective Lynn] says that you had sex, you're saying that that's a lie?

A:      Yes, sir.

Q:      And then when you're at the station before you go on tape and you tell him you had sex, you're saying you never said that too, correct?

A:      I ain't never say I didn't and I ain't never say I did.

Q:      So you're sticking to your guns, you're telling him, nope never - -

A:      I'm sticking to my story - - I'm sticking to my story the whole way.

(Dkt. #15, ex. 1, Vol. V, pp. 78-80).

12

also acknowledged that he has had prior interactions with law enforcement, having been arrested for battery on an official and accessory after the fact. (Dkt. #15, Ex. 1, Vol. V, p. 80).

After considering all of this testimony, the state trial court denied the motion to suppress:

> After review of the Motions, applicable law, and after observing and evaluating the testimony, evidence, exhibits, and arguments of the parties, as well as the demeanor, credibility and veracity of the witnesses presented at the hearings conducted by the Court on October 22, 2007, and continued on October 24, 2007, the Court finds as follows:

> FINDINGS OF FACT

> On or about February 8, 2007, Detectives from the Polk County Sheriff's Office responded to a call regarding the alleged kidnapping and rape of an 11 year old girl. The victim alleged that the suspect was known as "JJ" and indicated that Defendant, who was walking down the street at the time that detectives were talking to the victim, would be able to give officers the real name of "JJ." Detectives then made contact with Defendant to gather information. Defendant was not considered a suspect. Upon being asked, Defendant voluntarily agreed to go to the Bartow office of the Bureau of Criminal Investigation ("BCI") to discuss the matter further, and Defendant's aunt drove him there. While at BCI, Defendant claimed that he did not know the identity of "JJ" and did not have information about the crime. The interview was not recorded, as detectives were merely seeking information from Defendant. No promises were made to Defendant, he was not threatened or coerced and was never told that he was not free to leave. Upon his aunt's request, the interview was concluded and Defendant was driven home by his aunt.

> The following day, while at school, Defendant approached the resource officer at Mulberry High School, Detective Tina Coleman, and requested to speak to her privately. Defendant had spoken to Detective Coleman on prior occasions and Detective Coleman testified that Defendant seemed very comfortable talking to her. The ensuing discussion occurred in the school clinic with only the Defendant and Detective Coleman present. During the conversation, Defendant told Detective Coleman that he had information about the case. Defendant then indicated that he had consensual sex with the victim several days prior. Defendant was never told that he

13

could not leave, and there were no promises, threats or coercion. Detective Coleman informed Defendant that she would have to notify the Polk County Sheriff's Office, and while Detective Coleman testified that Defendant seemed nervous, he agreed to speak to them if his aunt was present. Defendant then went to class and Detective Coleman contacted the Sheriff's Office.

When Detectives Christopher Lynn and David Cavanah arrived at Mulberry High School, Detective Coleman informed them of the information received from Defendant. Defendant was then summoned from class. Defendant agreed to be interviewed but did not want to talk to Detective Cavanah. Detective Lynn borrowed Detective Cavanah's voice recorder and went outside with Defendant. Several of Defendant's family members were present. Detective Lynn activated the voice recorder and placed it in his pocket. During the ensuing discussion, Defendant admitted to having consensual sex with the victim. Again, Defendant was not threatened, coerced or promised anything. Detective Lynn testified that Defendant was at least of average intelligence and was coherent. Defendant was then arrested, taken to the Bureau of Criminal Investigations, mirandized [sic] (*See Miranda v. Arizona*, 384 U.S. 436 (1966)), and given food. Defendant indicated that he understood all of his rights and also signed a Miranda waiver form. Defendant then confessed again during a pre-interview, and then again in a taped statement.

Upon attempting to listen to the recording of the confession made at Mulberry High School, it was discovered that it was inaudible, possibly due to the thickness of the detective's jacket, the fact that they were speaking in a low tone, or the windy conditions. The inaudible recording was thereafter deleted.

Defendant, during his testimony, claims that he did not have a sexual encounter with the victim and only said he did in the recorded statement because he was scared and nervous. Defendant also claims that he did not go to BCI voluntarily, and that he was threatened by detectives with life imprisonment or a death sentence if he did not speak. However, later in his testimony, Defendant stated that the alleged threats were not the reason that he agreed to speak, but that he wanted to give the detectives

14

information.[9]  Further, when testifying about his discussions with Detective Lynn, Defendant stated the following:

> Q:    When you're talking man to man to Detective Lynn, on tape, did he make you any promises?
>
> A:    No, sir.
>
> Q:    Did he threaten you at all?
>
> A:    No, sir.
>
> Q:    Did he talk in a pretty normal tone of voice?
>
> A:    Yes, sir.
>
> Q:    And you manned up to what you did, correct?
>
> A:    Yes, sir.

Defendant had prior experience with law enforcement, as Defendant himself testified that he had priors for battery on a law enforcement officer and accessory after the fact.

---

[9] Petitioner testified that he went to the BCI to speak with the police on the night of February 8, 2007:

Q:    Is it fair to say the only reason you talked to the detectives is because you felt threatened?  No?  Why did you talk to them?

A:    Because I was just trying to get them some information about - - at first - - at first I ain't [sic] know what they was [sic] talking about.  Because when they came to me it was like they needed - - they came to me when I was at my house.  It was like they surrounded me behind my house so  talked to - - they said we need to talk to you, we hard you got some information - - somebody said you got some information that you need to tell.  And I was like, I don't know what you're talking about and then I asked - - I said, can you tell me what it is, did somebody do murder or anything?  They was like, I can't tell you and everything.  And I was like well, then how can I help ya'll if ya'll can't tell me?

Q:    And this was the night of February 8th?

A:    Yes, sir.

(Dkt. #15, ex. 1, Vol. V, pp. 71-72).

<u>CONCLUSIONS OF LAW</u>

I.      Motion to Suppress Confession or Admission

In his *Motion to Suppress Confession or Admissions,* Defendant seeks to suppress any and all statements made to law enforcement based upon the allegation that the statements were in violation of *Miranda,* not knowingly and voluntarily given, and were obtained by threats, promises or assertion of improper influence.

First, in Florida, the Courts are required to undertake a four-part analysis in determining whether a person is in custody for purposes of *Miranda:*

> 1)      The manner in which police summon the suspect for questioning;
>
> 2)      The purpose, place, and manner of the interrogation;
>
> 3)      The extent to which the suspect is confronted with evidence of his or her guilt; and
>
> 4)      Whether the suspect is informed that he or she is free to leave the place of questioning.

*Ramirez v. State*, 739 So. 2d 568 (Fla. 1999).  *See also Mansfield v. State*, 758 So. 2d 636 (F1a. 2000); *Cillo v. State*, 849 So. 2d 353 (Fla. 2d DCA 2003).

As to the first factor, in the interviews that occurred on February 8, 2007, Detectives simply asked Defendant for interviews and Defendant voluntarily went to BCI with his aunt.  When Defendant's aunt requested that the interview be over, it was ceased and Defendant left with his aunt.  Regarding the interview with Detective Coleman at Mulberry High School, it was Defendant himself who approached her and asked to discuss the matter.  Regarding the interview with Detective Lynn outside the school, Defendant was summoned from class as a direct result of his voluntarily seeking out Detective Coleman to discuss the matter.  As a result of these facts, the Court finds that these circumstances do not lend themselves to a finding that Defendant was in custody at any time prior to his arrest.

As to the second factor, during each of these pre-arrest interviews the purpose of the interviews was to gather information about the allegations.  In the initial interview at BCI, the Defendant was not even a suspect and was free to leave at any time, and in fact did leave at the request of his aunt.  The interview with Detective Coleman occurred in the school clinic, as it provided a location where they could speak

16

privately, as Defendant had requested. The interview with Detective Lynn occurred outside the school, on a bench, and in the presence of Defendant's family members. Again, the Court finds that these circumstances do not lend themselves to a finding that Defendant was in custody at any time prior to his arrest.

As to the third factor, during each of these pre-arrest interviews the Detectives never presented Defendant with any evidence of his guilt. In fact, Defendant was not even considered a suspect. It was Defendant himself who provided all of the information regarding his involvement. Accordingly, the Court finds the third factor does not lend itself to a finding that the Defendant was in custody.

As to the fourth factor, as stated above, Defendant voluntarily agreed to the first interview at BCI and the following pre-arrest interviews occurred as a direct result of Defendant's request to discuss the matter. Defendant was never advised that he was not free to leave. Accordingly, the Court finds the fourth factor does not lend itself to a finding that the Defendant was in custody.

Based on the totality of the circumstances, the Court finds the circumstances surrounding the pre-arrest interviews of Defendant do not constitute a custodial setting and Defendant's statements and admissions to law enforcement were knowingly and voluntarily made. As Defendant was not in custody, *Miranda* warnings were not required. *Davis v. State*, 698 So. 2d 1l83 (F1a. 1997). Accordingly, Defendant's pre-arrest statements are admissible.

Next, we turn to the events that occurred after Defendant was arrested. After his arrest, Defendant was mirandized [sic], and he signed a waiver of *Miranda* rights. In analyzing whether *Miranda* rights has been validly waived, it must be determined (1) that the waiver was made voluntarily and without coercion, and (2) it must have been knowingly and intelligently made. *Ramirez v. State*, 739 So. 2d 568 (Fla. 1999).

There is a five-part analysis to determining whether a juvenile defendant knowingly and intelligently waived his *Miranda* rights:

1)  The manner in which the *Miranda* rights were given, including any trickery or cajoling;

2)  The defendant's age, intelligence, background, and experience;

3)  Whether the juvenile's parents were contacted and given an opportunity to speak with him before questioning;

17

4)     The location of the questioning; and

5)     Whether police obtained a written waiver of the *Miranda* rights.

*Ramirez v. State*, 739 So. 2d 568 (Fla. 1999); *Benitez v. State*, 952 So. 2d 1275 (Fla. 2d DCA 2007).

Regarding the first element, after Defendant was arrested he was transported to BCI, read his *Miranda* rights directly from a *Miranda* card and Defendant indicated that he understood them. Defendant was provided with food. There is no finding of any trickery or cajoling, or that the confession was not knowingly and intelligently made.

Regarding the second element, Defendant was 17 years old, was of at least average intelligence, and had prior experience with law enforcement. Again, there is nothing concerning the second element to indicate that the confession was not knowingly and intelligently made.

Regarding the third element, Defendant's aunt took him to his initial interview at BCI, and his aunt and grandmother were both present during the school interview with Detective Lynn and at the time of his arrest. They were informed where Defendant would be taken subsequent to his arrest. Again, these facts do not lend themselves to a finding that the confession was not knowingly and intelligently made.

Regarding the fourth element, after Defendant's arrest, he was transported to BCI. Although the BCI is a law enforcement building, not only had Defendant made his statements and confessions to law enforcement officers on several prior occasions, but Defendant had also been at BCI the previous evening and declined to provide any information regarding the events. Therefore, it could be surmised that Defendant did not find the location so coercive that he felt forced into making statements. Again, these facts do not lend themselves to a finding that the confession was not knowingly and intelligently made.

Regarding the fifth element, Defendant was read his *Miranda* rights and then signed a *Miranda* waiver. Defendant indicated verbally and on the form that he fully understood his rights. Yet again, the facts do not lend themselves to a finding that the confession and statements were not knowingly and intelligently made.

As to the analysis of whether the confession was voluntary, without police conduct causally related to the confession, it cannot be said that a juvenile's confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Defendant himself sought out law enforcement in order to make his

18

statements. Law enforcement did not even consider Defendant a suspect until he made his voluntary statements. There were no threats or promises made to elicit his confession. Furthermore, even assuming for the sake of argument that there was some sort of threat, Defendant himself testified that the alleged threats were not the reason that he agreed to speak, but that he wanted to give the detectives information. As such, the confession could not be said to be causally related to police conduct as required by *Connelly*.

Based on the totality of the circumstances and its analyses set forth above, the Court finds that the statements, confessions, and *Miranda* waiver were voluntarily, knowingly and intelligently made, and as such, Defendant's statements are admissible.

(Dkt. #15, Ex. 1, Vol. I, pp. 110-15).

The record supports the state court's rejection of the motion to suppress.[10] Petitioner voluntarily spoke to Officer Coleman and Detective Lynn at the school on February 9, 2007. The interview was not excessive in duration and Detective Lynn did not threaten or coerce Petitioner. Petitioner was never handcuffed, shackled, or physically restrained in any way during questioning at the school. Petitioner was neither advised that he was not free to leave the interview with Detective Lynn outside of the school nor restrained during that interview to the degree associated with a formal arrest at any time before he admitted to the sexual intercourse with the victim. *Stansbury v. California*, 511 U.S. at 320; *Yarborough v. Alvarado*, 541 U.S. at 661. Even liberally construing the facts of this case to Petitioner's advantage, reasonable jurists could disagree as to whether Petitioner was in custody when he made his pre-*Miranda* statements. *See Yarborough v. Alvarado*, 541 U.S. at 664 (holding

---

[10] Although the state court's custody analysis relies mostly upon state law rather than federal law, no explicit citation to federal law is required. A state court need not cite Supreme Court precedent (or even be aware of it) if the decision is consistent with the precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Parker v. Sec'y of Dep't of Corr.*, 331 F.3d 764, 775-76 (11th Cir. 2003).

that the state court's application of clearly established federal law was reasonable because "fair-minded jurists could disagree over whether [the defendant] was in custody"). *See also Casnave v. Lavigne*, 169 Fed.Appx. 435, 442-43 (6th Cir. 2006) ("[R]easonable jurists could disagree as to whether petitioner was in custody during his interrogation; therefore we do not find that the state court unreasonably applies clearly established federal law in determining that petitioner was not in custody."); *Davis v. Jones*, 441 F.Supp.2d 1138, 1209 (M.D. Ala. July 7, 2006) ("It is clear from the teachings of [*Yarborough v.*] *Alvarado* that, when the circumstances demonstrate that a jurist reasonably could conclude that [a defendant] was in custody or that he was not in custody, the state court's determination falls within the realm of reasonableness on federal habeas review."). Consequently, the state court neither unreasonably applied clearly established federal law nor unreasonably determined the facts in rejecting Petitioner's claim that the state trial court erred in denying his motion to suppress based on an allegedly erroneous conclusion that he was not in custody when he made his pre-arrest statements at the school.

To the extent that the petition, liberally construed, challenges the denial of the motion to suppress Petitioner's post-*Miranda* statements, Petitioner is likewise not entitled to relief. As a threshold matter, this court considers the validity of Petitioner's waiver of his *Miranda* rights. A valid *Miranda* waiver, (1) must result from a free and deliberate choice by a defendant rather than from intimidation, coercion or deception, and (2) must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the

'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Burbine*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (citations omitted)).

The record supports the state court's conclusion that Petitioner freely and voluntarily told Officer Coleman about his sexual encounter with the victim and that he freely and voluntarily told Detective Lynn about the encounter during their discussion at the school, resulting in Petitioner's arrest. Once at the police station, Detective Lynn read Petitioner his *Miranda* rights and had Petitioner sign a written waiver. Petitioner neither claims nor presents any record evidence demonstrating that he did not understand this waiver. Petitioner does not argue that the *Miranda* warnings were defective. Consequently, he fails to show that the state court's rejection of his motion to suppress his post-*Miranda* statements resulted in either an unreasonable application of federal law or an unreasonable determination of the facts.[11] *See* 28 U.S.C. § 2254(d)(1), (2). *See also Berkemer v. McCarty*, 468 U.S. 420, 433

---

[11] To the extent that Petitioner argues that the decision in *Missouri v. Seibert*, 542 U.S. 600 (2004), requires a finding that the "question-first, Mirandize-second" form of questioning used by Detective Lynn at the school renders his statements inadmissible, no relief is warranted. Petitioner presented no substantive *Seibert* claim to the state courts, arguably rendering the claim unexhausted. Even assuming, *arguendo*, that Petitioner exhausted his *Seibert* claim, the claim lacks merit. In *Seibert*, the Supreme Court examined an interrogation procedure in which a police officer consciously withheld *Miranda* warnings during a custodial interrogation until the interrogation produced a confession,

after which the police gave the defendant *Miranda* warnings and re-obtained the confession. *Missouri v. Seibert*, 542 U.S. at 604. The Court held that the second, post-*Miranda* confession was inadmissible because the police had deliberately delayed giving *Miranda* warnings in an attempt to elicit a pre-warning confession. Petitioner's case is distinguishable from *Seibert* because Petitioner was not in custody when he made his initial pre-warning statements either at the BCI on February 8, 2007, or at the school to Detective Lynn on February 9, 2007. The record shows that after the police arrested Petitioner and read him his *Miranda* rights, he voluntarily waived those rights and reiterated his account of the crime.

n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.").

### Evidentiary Hearing

This case warrants no evidentiary hearing because "it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief." *Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2003).

### CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these

circumstances.  Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

It is therefore ORDERED AND ADJUDGED that:

1.     Petitioner's petition for the writ of habeas corpus (Dkt. #1) is DENIED.

2.     The Clerk is to enter judgment for Respondent and close this case.

**DONE** and **ORDERED** in Tampa, Florida on November 14, 2011.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

JSM:kw

F:\Docs\2010\10-cv-1796.deny 2254.wpd

23